**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**UNITED STATES OF AMERICA,**

  **Plaintiff,**

 v.

  Case No. 2:20-cr-203 (1)
  Judge Sarah D. Morrison

**RICCO L. MAYE,**

  **Defendant.**

## OPINION AND ORDER

This matter is before the Court on Defendant Ricco L. Maye's Motion to Suppress the Riverside Hospital Stop, Search, and Seizure. (ECF No. 350.) The Government responded in opposition. (ECF No. 356.) At the Court's request (*see* ECF No. 496), the parties filed supplemental briefing. (ECF Nos. 509, 515.) The parties then appeared for an evidentiary hearing on July 9, 2024. (*See* ECF No. 521.) For the reasons below, the Motion is **DENIED**.

### I. BACKGROUND

In the late morning of September 2, 2019, Riverside Methodist Hospital Protective Services Officer ("PSO") Tony Wilson encountered Mr. Maye and Melanie McCoy in a parking lot on the far west side of the hospital grounds. (Hr'g Tr., ECF No. 554, 42:21–22, 53:22–25.) Ms. McCoy had parked her Chevy in the lot, which was reserved for employees, and she and Mr. Maye were arguing. (*Id.*, 53:19–21.) PSO Wilson reported his encounter on the Protective Services radio. When PSO John Hoffman heard Wilson's report, he also heard shouting in the background.

(Hr'g Tr., 42:52–43:3.) PSO Hoffman responded to provide support. (Def.'s Ex. 1.) On approach, PSO Hoffman observed Mr. Maye "pacing back and forth." (Hr'g Tr., 43:10.) The PSOs contacted the Columbus Division of Police ("CPD") for assistance. (*Id.*, 43:11–14.) As they waited for police, PSO Hoffman saw Mr. Maye "walk[] away, across like a little grassy walkway behind a tree and then walk[] back." (*Id.*, 43:15–17; *see also* Def.'s Ex. 1.) A public walking path bisected the grassy area where Mr. Maye stood. (Hr'g Tr., 22:13–15.)

CPD dispatchers marked the incident as a Domestic Dispute, using Code 10-17A. (*Id.*, 7:2–14; *see also* Gov't Exs. 2A, 2B.) It is CPD's practice to dispatch two officers on Code 10-17A runs, "because domestic disputes . . . are one of [the] most dangerous calls for officers." (Hr'g Tr., 7:20–22.) CPD Officers Keith Conner and John Fantin went to Riverside.

Officer Conner arrived first and found Mr. Maye and Ms. McCoy "yelling and screaming" at each other. (*Id.*, 10:8; *see also* Gov't Ex. 1.) He observed that the Chevy "was in extremely poor condition" and looked as though someone had been living out of it. (Hr'g Tr., 8:14–16.) Mr. Maye was "standing toward the back of the Chevy . . . in a grassy area where there was a tree[.]" (*Id.*, 10:18–20.) Officer Conner estimates that Mr. Maye stood ten-to-twelve feet from Ms. McCoy. (*Id.*, 22:12–20.)

Officer Fantin arrived a short time later and, seeing Officer Conner engaged with Mr. Maye, approached Ms. McCoy. (*Id.*, 32:16–17.) Ms. McCoy alerted Officer Fantin that she had ingested an overdose of fentanyl and needed medical attention,

2

so he called for a medic.[1] (*Id.*, 11:6–10, 32:17–19.) Meanwhile, Officer Conner, aware of Ms. McCoy's alert, patted-down Mr. Maye. (*Id.*, 12:11.) He explained at the hearing:

> [W]hen somebody is OD'ing, and I don't know the whole situation, what the relationship is, for my own safety . . . , I can do a patdown to make sure there's no immediate weapons that he could get to[.]

(*Id.*, 12:11–15.) Officer Conner located a bulge in Mr. Maye's pocket during the pat-down, which Mr. Maye confirmed to be cash. (*Id.*, 12:19–13:1.) Officer Conner asked Mr. Maye for consent to search his pockets; when Mr. Maye refused, Officer Conner did not search any further. (*Id.*, 13:2.)

During this time, PSO Hoffman walked to the grassy area behind the Chevy where he and Officer Conner had both observed Mr. Maye. (*Id.*, 10:18–20, 43:15–16.) In a contemporaneous witness statement prepared for CPD, PSO Hoffman wrote:

> While the CPD officers spoke with the male and female, I approached the area where the male had repeatedly been standing. At the base of a nearby tree, I observed a balled-up piece of paper. When I manipulated the container, I saw a plastic baggie containing white powder. I notified the CPD officer who secured it.

(*Id.*, 47:21–48:3; Def.'s Ex. 1.) In Officer Conner's recollection, the "notebook paper . . . looked like it had just been wadded up and thrown to the ground within the close proximity of Mr. Maye." (Hr'g Tr., 13:17–22; *see also id.*, 43:18–22.) When Officer Conner opened the wad of paper, he found "a small ball of what appeared to

---

[1] Officer Fantin later accompanied Ms. McCoy to the Emergency Department. (Hr'g Tr., 33:10–13.) He reported that she had no visible injury and did not claim to be the victim of domestic violence. (*Id.*, 39:13–21.) Officer Fantin cleared the scene and left Ms. McCoy under the care of Riverside physicians. (Gov't Ex. 2B.)

3

be crack cocaine." (*Id.*, 14:2.) He then "immediately walked over to Mr. Maye and placed him under arrest." (*Id.*, 14:4–6; *see also id.*, 43:23–25, Def.'s Ex. 1.) Officer Conner searched Mr. Maye in the course of placing him under arrest, recovering a wad of cash and a cell phone. (Hr'g Tr., 14:9, 15:17–18.)

Mr. Maye now argues that the Officers violated his Fourth Amendment rights when they (i) detained him in the parking lot, (ii) patted him down, (iii) arrested him, and (iv) searched his person.

## II. ANALYSIS

The Fourth Amendment to the United States Constitution provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. CONST. amend. IV.

### A. Officer Conner had reasonable suspicion for the investigative detention.

Mr. Maye's Fourth Amendment interests were first implicated when he was detained in the Riverside Hospital parking lot. Mr. Maye characterizes this detention as a *Terry* stop. (ECF No. 350, PAGEID # 909 (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).) *Terry* "permits a police officer briefly to detain a person or property for investigative purposes if the officer has a reasonable suspicion, supported by articulable facts, that criminal activity has occurred or is about to occur." *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005). The Sixth Circuit has explained that "[r]easonable suspicion exists when, based on the totality of the circumstances, a police officer has a particularized and objective basis for suspecting the particular

4

person stopped of criminal activity." *Bey v. Falk*, 946 F.3d 304, 313 (6th Cir. 2019) (further citation omitted). Although an officer's "inchoate and unparticularized suspicion[s]" are not to be given weight, courts should consider "the specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27.

Responding to a reported domestic dispute, Officer Conner arrived on the scene to find Ms. McCoy and Mr. Maye arguing. They were engaged in this dispute on private property, in a parking lot reserved for Hospital staff, and Riverside PSOs had requested CPD presence. Under these circumstances, Officer Conner had reasonable suspicion to briefly detain Mr. Maye for investigative purposes.

### B. Officer Conner had reason to conduct a protective search for weapons.

Mr. Maye next asserts that Officer Conner's pat-down search violated his Fourth Amendment rights. A warrantless search is presumptively unreasonable unless an exception applies. *Katz v. United States*, 389 U.S. 347, 357 (1967). In *Terry*, the Supreme Court explained that a "protective search for weapons"—in other words, a pat-down search—"constitutes a brief, though far from inconsiderable, intrusion upon the sanctity of the person." *Terry*, 392 U.S. at 26. Still, the Court recognized that

> there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime.

5

*Id.* at 27. In evaluating the reasonableness of such a search, the question becomes "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.*

Officer Conner responded to a report of a domestic dispute, which is understood to be one of the "most dangerous" calls for law enforcement. When he arrived, he found Ms. McCoy and Mr. Maye arguing. He observed the condition of Ms. McCoy's Chevy and, soon after, heard Ms. McCoy tell Officer Fantin that she was overdosing on a dangerous illegal substance. These circumstances gave Officer Conner sufficient reason to believe that his, or Ms. McCoy's, safety was in danger. What's more, the pat-down search was no more intrusive than reasonably necessary. Officer Conner patted the outside of Mr. Maye's clothing; he concluded the search after Mr. Maye denied him permission to search inside his pockets.

**C.    Office Conner had probable cause to arrest.**

Mr. Maye next challenges his arrest. A warrantless arrest is reasonable under the Fourth Amendment only "where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Henry v. United States*, 361 U.S. 98, 102 (1959).

Mr. Maye argues that Officer Conner lacked probable cause because "[n]o one saw [him] throw anything on the ground." (ECF No. 350, PAGEID # 910.) But "probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243

6

n.13 (1983) (emphasis added). Whether anyone saw Mr. Maye throw the notebook paper behind the tree goes to the Government's ability to establish Mr. Maye's guilt on every element of the charged offense—not Officer Conner's probable cause to arrest him for it.[2]

Meanwhile, the facts and circumstances known to Officer Conner gave him ample reason to believe that Mr. Maye had possessed an illegal substance. To begin, when Officer Conner arrived on-scene, he observed Mr. Maye standing near the tree where the notebook paper was later found. Mr. Maye was being "yell[ed] and scream[ed]" at by Ms. McCoy, who appeared to be living out of her car and who claimed to have ingested an overdose of fentanyl. Mr. Maye told Officer Conner that he was "between homes," (Gov't Ex. 1), but he had a thick wad of cash in his pants pocket. "Probable cause . . . is not a high bar[.]" *Kaley v. United States*, 571 U.S. 320, 338 (2014). The circumstances here, when viewed in totality, easily clear it.

### D. Office Conner's search incident to Mr. Maye's arrest satisfies an exception to the warrant requirement.

Law enforcement may conduct a warrantless search of an arrestee's person in connection with a lawful arrest, both to ensure officer safety and prevent destruction of evidence. *Riley v. California*, 573 U.S. 373, 383 (2014). In *Rawlings v. Kentucky*, the Supreme Court held that the search-incident-to-lawful-arrest

---

[2] The Government argues that the drugs found at the base of the tree were abandoned property and are thus not properly subject to a motion to suppress. (*See* ECF No. 356, PAGEID # 944 (citing *United States v. Nelson*, 725 F.3d 615, 622 (6th Cir. 2013) ("The warrantless search and seizure of abandoned property does not violate the Fourth Amendment[.]")).) Mr. Maye does not respond to the argument or dispute the theory's application here. The Court agrees with the Government.

7

exception to the warrant requirement permits a search <u>before</u> an individual is arrested only if the fruits of the search are not necessary to sustain probable cause for the arrest and "the formal arrest followed quickly on the heels of the challenged search." 448 U.S. 98, 110–11 n.6 (1980). Still, it is the fact of the arrest that justifies a search under this exception. *United States v. Smith*, 549 F.3d 355, 361 (6th Cir. 2008) (citing *United States v. Robinson,* 414 U.S. 218, 235 (1973)); *Bennett v. City of Eastpointe,* 410 F.3d 810, 824 (6th Cir. 2005).

To justify a warrantless search incident to arrest, then, the Government must show that (1) there was probable cause to arrest, (2) an arrest preceded or quickly followed the search, and (3) neither the arrest nor probable cause to arrest depended on the fruits of the challenged search. First, the Court has already concluded that Officer Conner had probable cause to arrest Mr. Maye. Second, it is unclear from the evidence whether the challenged search occurred before or after Mr. Maye's arrest, but it is undisputed that the two events were near-simultaneous. Finally, the search recovered only a large sum of money (which Mr. Maye had told Officer Conner was in his pocket) and a cell phone—neither of which gave rise to the arrest or incident search.

Mr. Maye's Motion to Suppress the Riverside Hospital Stop, Search, and Seizure (ECF No. 350) is **DENIED**.

### III. OTHER ISSUES

Submitting both evidence and argument, Mr. Maye urges the Court to come to the opposite conclusion. Mr. Maye's efforts are unavailing.

### A. Mr. Maye offers a different version of events leading up to his arrest on September 2, 2019.

Testifying at the hearing, Mr. Maye made clear that he believes the facts surrounding the September 2, 2019 incident are different from those presented by the evidence and other witnesses. Mr. Maye's version of events is below:

Mr. Maye spent the previous night in a "treehouse" near Riverside Hospital with his Co-Defendant Nicole Groves. (Hr'g Tr. 96:4–9.) He had arranged to get a ride from Ms. McCoy and planned to meet her in the Riverside Hospital parking lot. (*Id.*, 96:19–21.) Mr. Maye and Ms. Groves walked across the train tracks to meet Ms. McCoy. (*Id.*, 97:8–10.) Ms. Groves's pre-teen daughter later joined the pair, but soon went back across the train tracks. (*Id.*, 97:11–12.) Meanwhile, Mr. Maye and Ms. Groves observed Ms. McCoy "brisk walking away from Riverside" PSOs in the parking lot. (*Id.*, 97:12–13.) The PSOs "grab[bed]" Ms. McCoy and "put her in handcuffs." (*Id.*, 97:15.) When Officer Conner pulled in, he "passed the incident, passed [Ms. McCoy] sitting on the ground, and jumped out and came strictly to [Mr. Maye]." (*Id.*, 97:18–20.) Mr. Maye testified under oath that he was sitting with Ms. Groves and her daughter at the time. (*Id.*, 97:25.) Officer Conner then patted him down and asked about the bulge in his pocket. (*Id.*, 99:1.) When Mr. Maye disclosed that the bulge was cash, Officer Conner "was all like, oh, that was too much money for a human being to have on their persons, and then he said something about some drugs over there that was by McCoy or whatever. Then he was all, like, with all this money, and the drugs over there, these must be your drugs." (*Id.*, 99:6–11.)

9

The point of Mr. Maye's testimony seems to be that the drugs recovered that day were not his—that he is innocent of the drug possession charge. But nothing in his version of events defeats Officer Conner's reasonable suspicion to conduct the *Terry* stop and pat-down or probable cause to arrest. Mr. Maye and his counsel will have ample opportunity to present evidence and witness testimony supporting his theory of innocence to a jury of his peers at the August 12, 2024 trial.

Three of Mr. Maye's ancillary arguments lead to the same conclusion.

*First*, Mr. Maye argues that the contrary testimony—specifically, Ms. McCoy's—is not credible. Moreso than the Court's Fourth Amendment analysis, Ms. McCoy's testimony is relevant to the Government's ability to establish Mr. Maye's guilt beyond a reasonable doubt. As a result, any determinations related to her credibility will be the province of the jury.

*Next*, Mr. Maye argues that the strength and weight of the evidence connecting him to the crack cocaine found on-scene is "slim." (*Id.*, 112:3–5.) That, too, is an argument for the jury.

*Finally*, Mr. Maye raises the Government's failure to retain footage from the responding Officers' cruiser- and body-worn cameras. (*See* ECF No. 509.) The record establishes that these videos were requested by federal Task Force Officer ("TFO") Sam Chappell on August 18, 2021. (Gov't Ex. 3.) Apparently because of a "backlog," TFO Chappell's request was not "acted upon" until September 16, 2021.[3] (Def.'s Ex.

---

[3] TFO Chappell's request form identified the correct incident numbers, but listed the incorrect units involved. (*See* ECF No. 509, PAGEID # 2176; *see also* Gov't Ex. 3.) Because the timely request was not processed before the videos were

10

3-1.) But the applicable records retention schedule had slated the videos for destruction on September 2, 2021—two years after they were first saved. (*Id.*) By the time TFO Chappell's request was processed, the videos had been destroyed. (*Id.*) Mr. Maye maintains that these videos would have supported his version of events and thus would have been "exculpatory." (Hr'g Tr., 101:14–15.) Mr. Maye seems to seek an adverse inference based on the unavailability of the videos, but he offers no authority entitling him to any such inference. The Court has evaluated the record before it for purposes of the Motion to Suppress and found no Fourth Amendment violation.

### B. Mr. Maye's brief reference to alleged racial bias does not warrant a different conclusion.

Finally, Mr. Maye has stated a belief that racial bias contributed to the events of September 2, 2019. (*Id.*, 111:18–21 ("[H]e thinks that he was picked out due to his race, because he's the only black person on the scene, and he's the only person out there with money in his pocket, and he's homeless and other things."); *see also* ECF No. 509, PAGEID # 2175 ("Mr. Maye claims he was a bystander who the police singled out . . . .").) Any allegation of racial bias in police conduct is serious. But the question now before the Court is whether the fruits of the September 2, 2019 search should be suppressed because Mr. Maye's Fourth Amendment rights were violated. Mr. Maye offers no evidence or legal argument connecting the alleged racial bias to the reasonableness of the *Terry* stop, pat-down

---

destroyed, it is unclear whether the inaccuracy would have prevented production of the videos.

11

search, arrest, or search-incident-to-arrest. The allegation alone does not move the needle.

## IV.  CONCLUSION

For the reasons above, Mr. Maye's Motion to Suppress the Riverside Hospital Stop, Search, and Seizure (ECF No. 350) is **DENIED**.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**